UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

DAWSON GOODPASTER,

    Plaintiff,

    v.

ECP AMERICAN STEEL, LLC,

    Defendant.

Civil Action No. 1:09-CV-59 JVB

**OPINION AND ORDER**

    The Motion for Summary Judgment before the Court presents an interesting question of successor liability for federally prohibited age discrimination in employment, allegedly committed by a business that became insolvent before Defendant, ECP American Steel ("ECP"), bought substantial chunks of its assets. Because successor liability is a flexible doctrine of equity, the basic question becomes whether the particular facts of this case justify treating the predecessor's inability to pay a judgment to Plaintiff as determinative, even where ECP had constructive notice of Plaintiff's claim and assuming it substantially continued its predecessor's business. (The evidence suffices to raise a reasonable inference of continuity.) In this Circuit among others, a predecessor's inability to pay is merely a factor; it's not always dispositive of successor liability. If that factor can ever trump the essential elements of notice and continuity, this isn't the case, so the Court will deny the Motion as to Plaintiff's federal claim.

    **A. BACKGROUND**

    Materials Handling Equipment Corporation ("MHEC") was a closely held business that sold and serviced heavy machinery. In 2008, MHEC terminated Plaintiff's employment, after

thirty years of service. Contending his termination violated the Age Discrimination in Employment Act ("ADEA"), Goodpaster sued MHEC on March 9, 2009. He later added a claim under Indiana law for unpaid wages. MHEC says it let go of Goodpaster simply because it couldn't afford to keep him. (MHEC's motion for partial summary judgment was denied on October 27, 2010.)

Either way, by May 13, 2010, MHEC's financial health had declined to the extent that the company had to surrender its assets to Grabill Bank. The same day, ECP, which refers to itself as a "'light manufacturing' company," bought the assets of MHEC's crane and lift-truck businesses. The proceeds from the asset sale were insufficient to satisfy MHEC's creditors, such that its shareholders apparently did not benefit from the transaction.

After the deal, Goodpaster amended his Complaint to name ECP as MHEC's successor-defendant for his ADEA and Indiana wage claims. ECP has moved for summary judgment on both. Goodpaster opposes summary judgment on the ADEA claim, but "asserts no successor liability" for Indiana wage claims. (Pl.'s Resp. Mot. Summ. J., DE 87, 16.) For that reason, ECP's Motion will be granted with respect to the Indiana wage claim.

After the asset purchase, MHEC became akin to a department within ECP (App. Def.'s Mot. Summ. J., DE 81, Watkins Aff. (Second) ¶ 3), even continuing to use MHEC's logo. (App. Pl.'s Resp. Mot. Summ. J., DE 89, Jacobs Dep. 32.) Once within ECP, MHEC kept selling the same product, but discontinued its relationship with Clark, developing one with Hyundai instead. ECP rehired many MHEC employees after the deal, including Kellen Watkins, MHEC's President, and ECP continued to lease the same building. The rehired employees performed the same jobs and received similar benefits as they had with MHEC. ECP closed two of MHEC's locations, however.

Eric Stetzel, President of ECP, had been interested in acquiring MHEC since about 2004. He believed MHEC's selling and servicing crane business would complement ECP's "below the hook" crane business. (App. Def.'s Mot. Summ. J., DE 81, Stezel Aff. ¶ 3.) Fortuitously, he interviewed Watkins for a job with ECP and thus learned MHEC was struggling. (App. Def.'s Mot. Summ. J., DE 81, Stetzel Dep. 19, Watkins Dep. (Second) 7–8.) Watkins had previously advised the Fishers, the family owners of MHEC, that an asset sale or bankruptcy were MHEC's only remaining options because the company had become financially unsustainable. After the job interview with Stetzel and discussions with the Fishers, Watkins agreed to negotiate the sale of MHEC's assets to ECP. He became ECP's sole point of contact at MHEC during the sale process. Afterward, ECP made him President of its MHEC division. (App. Def.'s Mot. Summ. J., DE 81, Watkins Aff. (Second) ¶ 3.)

Todd Jacobs, Chief Financial Officer of ECP's parent company, participated along with Stetzel in the decision to buy MHEC assets. Jacobs's deposition testimony is that because MHEC was a "broken business," "past financials were irrelevant," so he never examined any audits or statements of accounts. (App. Def.'s Mot. Summ. J., DE 81, Jacbos Dep. 9.) Jacobs asked accountants or attorneys about potential successor liability only "from the standpoint of acquiring the assets from the bank that they would be the cleanest form, that they would be buying the assets and all [ECP] had to do was worry about . . . [Uniform Commercial Code] claims" for security. (*Id.* at 11.) Stetzel testified similarly. (App. Pl.'s Resp. Mot. Summ. J., DE 89, Stetzel Dep. 65–69.) When Stetzel works for a company like ECP that is not publicly traded, he doesn't solicit certified financials of asset sellers. (*Id.*) He never asked for a legal opinion regarding liability or pending litigation in relation to MHEC. (*Id.* at 68.)

3

According to Watkins, ECP requested from Watkins only basic information on the nature and value of the assets, and Watkins's responsive offering omitted contingent liabilities. In his own words, Watkins had "two objectives . . . : (1) [He] needed a job and (2) [he] needed . . . to put the best polish on [MHEC] to get [ECP] enticed." (Watkins Dep. 10.) The total of ECP's investigation into MHEC consisted of a projection of the next six months of business (*id*. at 16), an examination of MHEC's previous two or three months of business (Jacobs Dep. 7), a survey of current employees on payroll (*id*.), a list of assets without contingent liabilities (Stetzel Dep. 73), Stetzel's inquiry after secured debts and clear title (*id.* at 51), and a tour of MHEC's facilities to ensure the assets were in working order (*id*. at 47; Jacobs Dep. 7). Goodpaster's suit was listed on MHEC's final audit, and Watkins says he refrained from passing it on to Stetzel out of fear it would taint the deal. (Watkins Dep. (Second) 10.) According to ECP, the company first heard of Goodpaster's suit one year after the purchase, when Stetzel received a lawyer's bill. (Stetzel Dep. 106.) (This bill was for the services provided to MHEC in defending the Goodpaster lawsuit. (*Id*.))

Goodpaster argues ECP substantially continued MHEC's business. Because Watkins informally, but in substance, became an ECP employee during the time leading up to the deal, Goodpaster further posits that ECP is chargeable with notice of his claim. After all, ECP's cash infusions financed MHEC's payment of Watkins's salary, and Watkins was awaiting a job with ECP. Alternatively, Goodpaster argues that even if ECP lacked actual notice, ECP's duty of due diligence necessitated calling upon MHEC to reveal pending federal anti-discrimination lawsuits. Goodpaster also argues that the jury should determine the credibility of the witnesses who deny that ECP had actual knowledge of his claim. (*Id*. at 7–10.)

Although ECP reads a binding authority to suggest that "the successor is obligated to inquire as to all potential . . . liabilities of the predecessor," it contends the cases ultimately do not support constructive notice for failure to perform due diligence. (Reply Br. 4.) Moreover, ECP claims Watkins's pre-transaction knowledge of Goodpaster's claim cannot be imputed to ECP because Watkins did not become ECP's agent until after the deal. ECP also argues Goodpaster's attacks on Stetzel's credibility fail to raise a genuine issue of notice.

ECP believes it is entitled to summary judgment for the further reason that MHEC's insolvency left it unable to pay a judgment to Goodpaster and because ECP didn't substantially continue MHEC's business. (Def.'s Br. Mot. Summ. J., DE 82, 12.)

On September 28, 2012, the Court entered a minute order granting ECP's Motion wholesale, explaining that a written opinion and order would follow. (DE 110.) The Court advised the parties on October 5 that they should not act on the minute entry and that the written order would represent the Court's ultimate resolution of the Motion. Upon further review of the "dreadfully tangled" doctrine of successor liability for federal claims, *EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988), and as explained below, the Court has concluded that MHEC's inability to pay a judgment to Goodpaster should not independently dispose of ADEA successor liability in this case and that the Motion should therefore be denied as to that claim.

### B. ANALYSIS

A reviewing court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion amounts to "put up or shut up" time, "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisc. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999), *unrelated dictum retracted by*

*Higgins v. Mississippi*, 217 F.3d 951, 953–54 (7th Cir. 2000). The question is whether the evidence raises any set of reasonable inferences that would enable the nonmoving party to prevail. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") If so, the motion is denied; otherwise, granted. *See id.*

This summary-judgment decision is all about successor liability, a "flexible" doctrine of equity, *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995), with just two essential elements when the underlying claim is for a violation of federal rights.[1] A buyer of substantial assets succeeds to a liability of this kind where the buyer (1) had notice of the plaintiff's claim before purchasing the assets, and (2) continued running the business afterward substantially as the predecessor had before the deal. *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994), *quoted in Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011) *and Tasemkin*, 59 F.3d at 49; *EEOC v. Vucitech*, 842 F.2d at 945. The overarching goal is to achieve fairness and protect federal rights without imposing unnecessary transaction costs. *See Vucitech*, 842 F.2d at 945 ("[T]he basic issue in every successorship case is how to strike a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating transfer of corporate assets to their most valuable uses.").

Substantial continuity means an absence of "major changes" in the underlying business. *G-K-G*, 39 F.3d at 747–48. Six factors guide the analysis:

---

[1] Successor liability for common-law claims is more narrowly confined. *See, e.g.*, *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994) (describing the "special federal common law doctrine of successor liability" as a "departure from the more limited approach of the common law generally").

> (1) whether the new employer uses the same plant; (2) whether it uses the same or substantially the same workforce; (3) whether it uses the same or substantially the same supervisors; (4) whether the same jobs exist under substantially the same working conditions; (5) whether it uses the same machinery, equipment, and methods of production; and (6) whether it produces the same product.

*Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 n.7 (7th Cir. 1986) (citation omitted).

MHEC functioned as a division of ECP after the sale. Most of the employees returned to work for ECP, including Kellen Watkins, who continued his leadership of the business. The rehired employees received similar benefits and performed the same jobs. ECP leased the same building MHEC leased before the deal, and ECP continued to use MHEC's logo. ECP did close two locations, and switched from contracting with Clark to dealing with Hyundai. But ECP in no sense repurposed MHEC's assets; there were no "major changes" to its business. For that reason, ECP will not obtain summary judgment on the basis of a lack of substantial continuity of the underlying business.

ECP has likewise failed to show its ignorance of Goodpaster's suit was reasonable. *See Vucitech*, 842 F.2d at 945 ("knew or should have known" standard); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 752 (7th Cir. 1985) (explaining that successors have a duty to exercise due diligence to learn of "all outstanding potential and actual liabilities"). The parties have not cited a case that explains in detail how constructive notice works in this context,[2] but a complete failure to ask about prospective liabilities of Goodpaster's type can hardly constitute due diligence with regard to "all outstanding *potential*" obligations. *Musikiwamba*, 760 F.2d at 752 (emphasis added). For a purchaser of large chunks of assets that substantially continues the predecessor's business line, a pending claim for a violation of a federal right is a potential liability. This allows

---

[2] The Court has also conducted its own research, and did not find such a case.

recovery from successors who were careless, as well as those whose ignorance was strategic.[3] Because ECP took no steps at all to discover such a claim, ECP had constructive notice of Goodpaster's suit. (As a result, it is unnecessary to consider whether the evidence raises a reasonable inference of actual knowledge.)

The possibility of being charged with constructive notice will promote the negotiation between asset buyers and sellers of prices that appropriately account for the risk of successor liability. And where the buyer substantially continues the predecessor's business, having done nothing to discover pending federal employment lawsuits, successorship should not turn solely on whether the deal was for shares or just large chunks of the predecessor's assets. That approach would give undue weight to form at the expense of substance and leave too many victims of employment discrimination uncompensated. Neither Congress nor the binding caselaw has intended such a result. *See, e.g.*, *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir. 1990) ("[T]he Supreme Court and this Circuit have imposed liability upon successors beyond the bounds of the common law rule in a

---

[3] An asset purchaser should not avoid successor liability under the expanded federal common-law standard by playing an unspoken but mutually understood game of "don't ask, don't tell."

> Business managers[, like lawyers,] understand the value of deniability. Analyzing the authority system in large American corporations, sociologist Robert Jackall writes that "pushing down details relieves superiors of the burden of too much knowledge, particularly guilty knowledge." In the familiar corporate adage, bad news doesn't flow upstream.
>
> A superior will say to a subordinate …: "Give me your best thinking on the problem…" When the subordinate makes his report, he is often told: "I think you can do better than that," until the subordinate has worked out all the details of the boss's predetermined solution, without the boss being specifically aware of "all the eggs that have to be broken."

David Luban, *Contrived Ignorance*, 87 Geo. L.J. 957, 958 (1999) (ellipses as in original) (footnotes omitted). Here we know Watkins and Stetzel talked about MHEC's financial distress; Watkins wanted ECP to hire him; and Watkins believed not letting bad news reach Stetzel would help him. Whether so intended or not, Watkins's actions preserved deniability for ECP. If actual knowledge were absolutely required, finding an ally like Watkins would be an effective stratagem for avoiding successor liability. The proper rule is one that encourages shoppers for substantial assets simply to get the whole story and adjust their offers accordingly.

number of different employment-related contexts in order to vindicate important federal statutory policies.").

But what of MHEC's inability to pay a judgment to Goodpaster, regardless of the asset sale? Where the evidence, construed in Goodpaster's favor, raises reasonable inferences of both elements of successor liability, the Court believes it would be inappropriate to grant summary judgment for this reason alone. Although relevant, per *Musikiwamba*, 760 F.2d at 751, more recent decisions have deemphasized the significance of a predecessor's inability to pay. In *Vucitech*, for example, Judge Posner wrote in 1988 for the Seventh Circuit that the district court had given "undue weight to the fact that because [the predecessor] had gone broke, there was an element of windfall" in successor liability. 842 F.2d at 945. "Certainly in an equity case, . . . the proper approach . . . is not to erect a set of hoops to force plaintiffs to jump through but to ask whether [successor] liability would strike a reasonable balance between the interest in fully sanctioning unlawful conduct and the interest in facilitating the market in corporate and other productive assets." *Id.* at 946. Thus, the Seventh Circuit treated the predecessor's inability to pay as non-dispositive, explaining that it is not an "ironclad requirement in all cases of successor liability." *Id.* The availability of relief from the predecessor wasn't critical in *G-K-G*, either, although in that case the asset seller "promised to indemnify [the buyer] for any liability that [the buyer might] be determined to have to [the plaintiff] and . . . retained sufficient assets to satisfy [the plaintiff's] judgment in full." 39 F.3d at 747–48. Nor was the predecessor's ability to pay determinative in *Tasemkin*, albeit a case where the transaction interfered with unsecured creditors. 59 F.3d at 51.

The Court recognizes that allowing successor liability despite the predecessor's inability to pay a judgment imposes transaction costs that could prevent some sales of substantial assets

9

from occurring. After all, valuing a potential liability of this sort always takes skill and often great effort. *Cf. Vucitech*, 842 F.2d at 944 ("[T]he interest in a fluid market in corporate assets . . . is impeded if purchasers acquire along with the assets legal liabilities of unknown, sometimes unknowable, dimensions."). Where no deal occurs and the insolvent prospective asset seller collapses, a plaintiff gains nothing, workers face greater difficulty finding a new employer, and a larger portion of debts goes unpaid. Moreover, successor liability doesn't deter wrongful conduct where proceeds from the asset sale aren't enough to satisfy all outstanding liabilities, because in such a case the shareholders' payoff from the transaction is zero either way. This analysis weighs in favor of treating a predecessor's inability to pay as dispositive. On the other hand, ECP has not argued all of these policy concerns, and the Court has no evidence of the rate at which non-dispositive treatment would actually forestall deals. Maybe the theoretical worries amount to an empirical nothing. And higher courts have consistently downplayed this factor in relation to other considerations that are *requirements* for successor liability. *Tasemkin*, 59 F.3d at 49; *G-K-G*, 39 F.3d at 747–48; *Vucitech*, 842 F.2d at 945; *see also Artistic Furniture*, 920 F.2d at 1327 (interpreting *Wheeler*, 794 F.2d at 1236, to mean the predecessor's ability to pay is critical only when it *can* pay). ECP has cited no federal labor or employment successor-liability decision granting summary judgment notwithstanding notice and continuity simply because the predecessor had gone broke before the asset sale.

     Meanwhile the Third Circuit has explicitly considered and rejected treating a predecessor's inability to provide the plaintiff's relief as dispositive of successor liability. *Brzozowski v. Corr. Physican Servs., Inc.*, 360 F.3d 173, 179 (3d Cir. 2004) ("[T]he mere substitution of a responsible defendant for an insolvent one is not a basis for denying successor liability."). ECP says allowing Goodpaster to recover under such circumstances creates a

10

windfall. It's true, of course, that this approach provides Goodpaster a prospect of recovery that results from the asset sale, but if Goodpaster wins on the merits, he will be recovering for an injury that he actually suffered. Congress intended that plaintiffs' fates in these cases should depend on the substance of their claims, if at all possible, not on discriminators' wealth. The *Brzozowski* Court saw the matter similarly, after considering Seventh Circuit precedents:

> [N]o other court has adopted an expanded view of successor liability similar to the one espoused by *Musikiwamba*.
>
> Concededly, the language in *Musikiwamba* is somewhat confusing, at least when read as an assertion that it is somehow unfair to provide a plaintiff with a better chance of recovering damages in a Title VII case from a successor rather than a penniless predecessor. To the extent that the plaintiff gains another source for satisfaction of her claim, of course, she is better off than the claimant whose only recourse is against a defunct or insolvent defendant. . . .
>
> The notion that successor liability cannot be invoked where it would leave the creditor "better off" is a curious one. The doctrine of successor liability is premised on the idea that the creditor cannot obtain satisfaction from the predecessor. To read this factor, or to impose a new one to require a court to look at whether the creditor is better off, seems to undermine the basic rationale underlying the doctrine.

*Id.* Moreover, "because the potential for this obligation has been well-established in the law for some time, there is nothing unfair about its application at this juncture." *Id.* at 178.

### C. Conclusion

The Court **GRANTS** ECP's Motion for Summary Judgment (DE 80) for Goodpaster's Indiana wage claim and **DENIES** the Motion as to his ADEA claim.

**SO ORDERED** on October 24, 2012.

                                                      s/ Joseph S. Van Bokkelen
                                                      JOSEPH S. VAN BOKKELEN
                                                      UNITED STATES DISTRICT JUDGE