**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| DAWSON GOODPASTER, <br><br> Plaintiff, <br><br> v. <br><br> NFLC, Inc., formerly known as <br> MATERIALS HANDLING <br> EQUIPMENT CORP., and <br> ECP AMERICAN STEEL, LLC, <br><br> Defendants. | Civil Action No. 1:09-CV-59 JVB |

**OPINION AND ORDER**

Dawson Goodpaster worked for Materials Handling Equipment Corporation ("MHEC") for thirty-six years, at first as a mechanic and finally as a senior salesman. By August 2008, as Goodpaster was turning sixty, MHEC's financial condition was in decline and he found himself in conflict with MHEC's president, Kellen Watkins. Goodpaster alleges Watkins told him he was getting too old, and MHEC fired Goodpaster early that month. Goodpaster asserts the firing was motivated by his age, and in March 2009, he sued in this Court under the Age Discrimination in Employment Act.

On May 13, 2010, ECP American Steel ("ECP") bought substantial assets formerly belonging to MHEC from Grabill Bank, which had taken them over from MHEC the same day. Goodpaster then amended his complaint to sue ECP as MHEC's successor. ECP moved for summary judgment on the premise that it could not be liable for MHEC's possible age discrimination. ECP claimed there was no genuine issue of fact as to the following potentially dispositive propositions: First, ECP lacked notice of Goodpaster's claim when it bought MHEC's assets. Second, MHEC's financial condition left it unable at the time of the purchase to

provide relief to Goodpaster. And third, ECP had not substantially continued MHEC's business.[1] (Br. Supp. Mot. Summ. J., DE 82, at 5–16.)

The Court denied the motion. As the Court explained, a reasonable fact finder could disagree with ECP about whether ECP substantially continued MHEC's business. And if ECP really was ignorant of Goodpaster's claim, then the cause was its own omissions. The Court thus declared ECP chargeable with constructive notice. Under *Equal Employment Opportunity Commission v. Vucitech*, 842 F.2d 936, 946 (7th Cir. 1988), the Court reiterated, the predecessor's ability to provide relief at the time of the succession is not an "ironclad requirement" for all cases. The Court decided this factor should not be determinative in Goodpaster's case. Under the circumstances, ECP had not shown that the fact it acquired MHEC's business by asset sale entitled it to judgment as a matter of law.

ECP has timely moved the Court to certify for interlocutory appeal its ruling charging ECP with constructive notice of Goodpaster's claim. This Opinion and Order denies that Motion, because constructive notice, though contestable in the relevant sense, is not controlling. ECP would not be entitled to summary judgment even if the Court of Appeals reversed the constructive-notice ruling, because it would not be unreasonable to find as a matter of fact that an agent of ECP had timely actual knowledge. Apart from this, it would not be unreasonable to impute Kellen Watkins's actual knowledge of Goodpaster's claim before the sale to ECP on the basis of equity. Because as shown below these additional alternative reasons for denying summary judgment are not abstract, "purely" legal rulings, in the relevant sense, it would be inappropriate to certify them all for interlocutory appeal.

---

[1] ECP did not argue Grabill Bank's role in the events had any effect on ECP's potential successor liability.

2

### A. STANDARD FOR CERTIFYING AN INTERLOCUTORY APPEAL

A district court should grant a timely petition for certification for interlocutory appeal of an order that "involves a controlling question of law as to which there is substantial ground for difference of opinion" whenever "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see also Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 675–76 (7th Cir. 2000) (defining *timely* as "within a *reasonable* time after the order sought to be appealed"). Each condition is necessary. *Ahrenholz*, 219 F.3d at 676.

*Controlling*, for purposes of interlocutory appeals, means "quite likely to affect the further course of the litigation." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996). It follows that if ECP was not entitled to summary judgment regardless of constructive notice, then constructive notice was not a "controlling" question of law.

*Question of law* in this context means an abstract, "purely" legal issue, "something the court of appeals could decide quickly and cleanly without having to study the record." *Ahrenholz*, 219 F.3d at 676–77.

### B. SUCCESSOR LIABILITY FOR FEDERAL EMPLOYMENT DISCRIMINATION CLAIMS

Successor liability for federal employment lawsuits such as this one is a judicially developed doctrine of equity. *See Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). It permits recovery from a buyer of substantial assets where the buyer had timely notice of the plaintiff's claim and then substantially continued the business for which the seller had used the assets. *EEOC v. G-K-G,*

*Inc.*, 39 F.3d 740, 748 (7th Cir. 1994). Other considerations, such as the seller's ability to satisfy the plaintiff's claim, may also be relevant. *Vucitech*, 842 F.2d at 946. "[I]n light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974).

### C. ECP's Purchase of Substantial Assets from MHEC

By May 13, 2010, when ECP made the large asset purchase in question (ECP's Stmt. Undisp. Mat. Facts ¶ 19, DE 81-1 at 5), Goodpaster's lawsuit against MHEC had been pending in this Court for 430 days. (Compl., DE 1, filed Mar. 9, 2009.) ECP does not contest Goodpaster filed an administrative charge against MHEC with the Equal Employment Opportunity Commission ("EEOC") before he sued. (*See id.* ¶ 16 ("Plaintiff filed his administrative charge with the Indianapolis office of the EEOC on November 5, 2008 . . . .").)

The Court previously summarized the events leading up to ECP's asset purchase as follows:

> Eric Stetzel, President of ECP, had been interested in acquiring MHEC since about 2004. He believed MHEC's selling and servicing crane business would complement ECP's "below the hook" crane business. (App. Def.'s Mot. Summ. J., DE 81, Stezel Aff. ¶ 3.) Fortuitously, he interviewed [Kellen] Watkins for a job[2] with ECP and thus learned MHEC was struggling. (App. Def.'s Mot. Summ. J., DE 81, Stetzel Dep. 19, Watkins Dep. (Second [Sept. 7, 2011]) 7–8.) Watkins had previously advised the Fishers, the family owners of MHEC, that an asset sale or bankruptcy were MHEC's only remaining options because the company had become financially unsustainable. After the job interview with Stetzel and discussions with the Fishers, Watkins agreed to negotiate the sale of MHEC's assets to ECP. He became ECP's sole point of contact at MHEC during

---

[2] The interview occurred in the fall of 2009 (ECP's Stmt. Undisp. Mat. Facts ¶ 8, DE 81-1), several months after Goodpaster filed his federal lawsuit against MHEC.

4

the sale process. Afterward, ECP made him President of its MHEC division. (App. Def.'s Mot. Summ. J., DE 81, Watkins Aff. (Second) ¶ 3.)

Todd Jacobs, Chief Financial Officer of ECP's parent company, participated along with Stetzel in the decision to buy MHEC assets. Jacobs's deposition testimony is that because MHEC was a "broken business," "past financials were irrelevant," so he never examined any audits or statements of accounts. (App. Def.'s Mot. Summ. J., DE 81, Jacbos Dep. 9.) Jacobs asked accountants or attorneys about potential successor liability only "from the standpoint of acquiring the assets from the bank that they would be the cleanest form, that they would be buying the assets and all [ECP] had to do was worry about . . . [Uniform Commercial Code] claims" for security. (*Id.* at 11.) Stetzel testified similarly. (App. Pl.'s Resp. Mot. Summ. J., DE 89, Stetzel Dep. 65–69.) When Stetzel works for a company like ECP that is not publicly traded, he doesn't solicit certified financials of asset sellers. (*Id.*) He never asked for a legal opinion regarding liability or pending litigation in relation to MHEC. (*Id.* at 68.)

According to Watkins, ECP requested from Watkins only basic information on the nature and value of the assets, and Watkins's responsive offering omitted contingent liabilities. In his own words, Watkins had "two objectives . . . . : (1) [He] needed a job and (2) [he] needed . . . to put the best polish on [MHEC] to get [ECP] enticed." (Watkins Dep. 10.)[3] The total of ECP's investigation into MHEC consisted of a projection of the next six months of business (*id.* at 16), an examination of MHEC's previous two or three months of business (Jacobs Dep. 7), a survey of current employees on payroll (*id.*), a list of assets without contingent liabilities (Stetzel Dep. 73), Stetzel's inquiry after secured debts and clear title (*id.* at 51), and a tour of MHEC's facilities to ensure the assets were in working order (*id.* at 47; Jacobs Dep. 7). Goodpaster's suit was listed on MHEC's final audit, and Watkins says he refrained from passing it on to Stetzel out of fear it would taint the deal. (Watkins Dep. (Second) 10.) According to ECP, the company first heard of Goodpaster's suit one year after the purchase, when Stetzel received a lawyer's bill. (Stetzel Dep. 106.) (This bill was for the services provided to MHEC in defending the Goodpaster lawsuit. (*Id.*))

(Order of Oct. 24, 2012, DE 111, at 3–4.)

It's also significant that even before the May 13, 2010, deal, ECP made smaller asset purchases from MHEC to keep it afloat. Watkins is "sure" he was calling Stetzel for money for MHEC as early as February 2010. (Watkins Dep. (Second) 27.) He explained: "[W]hat I would do is I would sell a fork truck. So, I would sell [Stetzel] a fork truck or something like that and

---

[3] ECP also highlights Watkins's testimony that he "wanted this pig [MHEC or its assets] to look as good as [he] could make it look." (ECP's Stmt. Undisp. Mat. Facts ¶ 15 (quoting Watkins Dep. (Second) 11).)

that's how I would get it. That's how it would be done." (*Id.*) Small asset sales to MHEC before May 2010 were part of how Watkins addressed MHEC's cash-flow problem and enabled the company to make payroll. (*Id.* at 28–29.)

D. SECTION 1292(B) ANALYSIS

1. Contestability

The Court's constructive-notice ruling is adequately contestable for interlocutory appeal. This area of the law has undergone no major changes since our appellate circuit described it as "dreadfully tangled" in *Equal Employment Opportunity Commission v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988). *See also Trs. of Chi. Plastering Inst. Pension Trust v. Elite Plastering Co.*, 603 F. Supp. 2d 1143, 1148–52 (N.D. Ill. 2009) (discussing no more recent case than *Vucitech* in analyzing the notice component of successor liability). On top of that, there is apparently no decision by the United States Court of Appeals for the Seventh Circuit or Supreme Court with enough factual similarity to this case that successor liability could be called an obvious outcome here.

Which is not to say the Court has changed its mind. Higher courts' precedents more strongly support denying a summary judgment based on successor liability than they support granting it.

ECP's brief casts as dictum the Seventh Circuit's statement that "[n]ormally, the burden would be on the successor to find out from the predecessor all outstanding potential and actual liabilities." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 752 (7th Cir. 1985) (proceeding to identify the exception as the scenario where, unlike this case, the successor "has exercised due diligence" and yet "failed to uncover evidence of the plaintiff's lawsuit"). It is true the existence of such a

burden was not the central issue in *Musikiwamba*, but this statement of the law played an important role in explaining the order to remand with leave to the plaintiff to amend his complaint in that case.

According to ECP, the Seventh Circuit moved away from the *Musikiwamba* decision's view of due diligence in *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir. 1986). But ECP has taken a slanted view of *Wheeler*, too, and it disregarded *Musikiwamba* at its own peril. Quoting *Musikiwamba*, 760 F.2d at 750, the Seventh Circuit reiterated in *Wheeler* that the notice requirement exists "because of the inequity of holding a successor liable when '. . . the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.'" 794 F.2d at 1236. (It is well established this is the basis for the requirement. *E.g.*, *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990).) Here, if ECP truly remained ignorant, its myopic inquiries of MHEC, its decision not to review public records or contact the EEOC, and Kellen Watkins's sealed lips—encouraged by incentives ECP created—were the reasons. So it would be a gross distortion to say ECP lacked an opportunity to protect itself. This is a large part of what could make the prospect of successor liability more equitable than denying relief without regard to whether Goodpaster was a victim of ADEA-prohibited discrimination.[4]

If ECP's view were the law, prospective liabilities of this sort could be shed by playing ostrich. Businesses would quickly learn they need only prevent actual knowledge on the part of the buyer. So no seller of substantial assets would volunteer the existence of the claim, because doing so would result in a lower price. And buyers, seeking to avoid the cost of valuing the prospective liability and the risk of underestimating it, would readily put blinders on.

---

[4] ECP does not argue the economic implications of permitting successor liability despite the predecessor's inability to satisfy the plaintiff's claim at the time of the sale.

*Wheeler* is also factually distinct from our case in a respect the Seventh Circuit indicated was very important. In declining to impose successor liability where the buyer lacked actual knowledge, the Court emphasized it was also critical that relief was available from the seller:

> [I]n the present case, in which the absence of any timely actual knowledge on the part of the successor is so clear, in which substantial, while not complete, relief from the predecessor is available to the victim, and in which the ownership of the predecessor and of the successor is totally distinct, we refrain from subjecting the doctrine of successor liability to judicial surgery on the scale which would be necessary to permit [the plaintiff] to obtain relief from [the successor].

*Id.* at 1237. The Seventh Circuit expressly declined to adopt the position ECP now advocates: "We are not prepared to hold that absence of timely actual knowledge is a bar to successor liability in every case." *Id.*

ECP is partially correct, however, when it comes to another case the Court relied on in denying summary judgment: Like *Wheeler*, *Vucitech* bears a very significant factual distinction from the present case. There, Alex Vucitech belonged to the group controlling MTC Gear Corporation. *Vucitech*, 842 F.2d. at 938. The Vucitech group instituted a policy that became the subject of EEOC charges of sex discrimination. *Id.* at 938–39. Later the group sold all its MTC stock to a man who went on to embezzle funds from the company. *Id.* at 939. Secured creditors seized MTC's assets and shut it down. *Id.* Then the Vucitech group bought back all of MTC's machinery and equipment and placed them in the new Profile Gear Corporation. *Id.* The Court lamented that "[t]he entire issue of successor liability, which is so important in regard both to common law torts . . . and to statutory torts such as discrimination in violation of Title VII, is dreadfully tangled." *Id.* at 944. But "[w]hatever the precise formulation of the rule should be in employment-discrimination cases, there [could] be little doubt that Profile [was] liable as MTC's successor." *Id.* at 945. For by the time the Vucitech group reassumed control, it

> knew *or should have known* that the original charges of sex discrimination had not been resolved—and upon inquiry of the EEOC about their status would

8

> quickly have learned that two additional charges had been filed. So there was no surprise; or at least there should not have been, and of course the Vucitech group's knowledge, actual *or constructive*, must be imputed to Profile, which they controlled.

*Id.* (emphasis added). In our case, of course, ECP had nothing to do with whatever age discrimination Goodpaster may have suffered while an employee of MHEC. This is undoubtedly an important distinction. Because of it, *Vucitech* doesn't *mandate* successor liability for this case. The Court did not believe otherwise in arriving at its October 24, 2012, opinion and order. The Court's constructive-notice ruling cites *Vucitech*'s language because it demonstrates that not only what an asset buyer actually knows, but also what it should know, is relevant to successorship analysis in federal employment suits. The Court stands by its October 24, 2012, order, but believes it is contestable enough to permit interlocutory appeal.

### 2. Controlling Issue

On the other hand, the Court can't certify a question for interlocutory appeal just because the answer is reasonably debatable. The issue must also be controlling. 28 U.S.C. § 1292(b); *Ahrenholz*, 219 F.3d at 676 ("The criteria are conjunctive . . . ."); *see also Sokaogon Gaming*, 86 F.3d at 659 (defining *controlling* as "quite likely to affect the further course of the litigation").

Here, a ruling by the Court of Appeals that ECP adequately performed due diligence would not automatically entitle ECP to summary judgment. Remaining open would be the question whether a fact finder could reasonably infer that someone whose knowledge was imputable to ECP actually knew of Goodpaster's claim. The Court previously declined to answer that question; *see* Opinion and Order, DE 111, at 8 (explaining an answer was then unnecessary because alternative sufficient grounds existed to deny summary judgment); but will do so now.

9

The Court begins by recalling the familiar admonition to view the record in the light most favorable to the non-moving party, drawing all reasonable inferences against summary judgment. *E.g.*, *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). This is not an occasion for weighing evidence. *Id.* "Even if one side's story is more believable, the court must 'avoid[ ] the temptation to decide which party's version of the facts is more likely true.'" *Id.* (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). On the other hand, "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009) (referring to Fed. R. Civ. P. 56(a)), *quoted in Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011).

### a. Agency-Based Imputation of Actual Knowledge

*Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168 (1973) and *Artistic Furniture*, 920 F.2d at 1329–30, cast light on the kind of evidentiary showing it takes to raise a reasonable inference of knowledge in the successor-liability context. "Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge form the circumstances." *Artistic Furniture*, 920 F.2d at 1329.

In its relevant segment, the *Golden State Bottling* opinion discusses whether All American Beverages bought Golden State's bottling-and-distribution business with knowledge of the NLRB's order to reinstate with backpay Kenneth Baker, a driver-salesman Golden State had discharged. 414 U.S. at 170–73. The NLRB had decided Baker's termination constituted an unfair labor practice. *Id.* at 170. The Supreme Court could not "find fault" with the Court of Appeals' conclusion that substantial evidence supported the NLRB's finding that All American

purchased these businesses "with knowledge" of unfair-labor-practice litigation against Golden State. *Id.* at 173. A handful of factual circumstances, set forth below, supported the inference of knowledge. *Id.* at 173–74. The commonalities with this case are impossible to ignore.

It was the secretary and manager of the bottling business, Eugene Schilling, who discharged Baker. *Id.* at 173. Schilling then "closely followed the progress of the litigation" and "continued with the enterprise under All American's ownership with the title of general manager and 'president.'" *Id.* All American had conditioned its purchase upon Schilling staying on in a managerial capacity. *Id.*

All these circumstances, save the express condition in the asset-sale contract, were present in the case of Kellen Watkins and the ECP-MHEC deal. Watkins was president of MHEC, discharged Goodpaster (Watkins Dep. (First (Dec. 17, 2009)) 15), and he's had no choice but to closely follow the litigation. Watkins continued running the MHEC business under ECP's banner, as he and ECP decided concurrently with the assets purchase. And in the MHEC transaction, an express condition probably wasn't necessary to ensure that Watkins would remain available to run the business. Watkins was already on the job market before MHEC's demise, and he expressly told Stetzel during his job interview that he would be interested in continuing with ECP if it bought MHEC or substantial assets from it. (Watkins Dep. (Second) 7.)

The *Golden State Bottling* opinion also relied heavily on the fact that Schilling had participated in sale negotiations with Golden State's president on "at least one occasion." 414 U.S. at 173. For his part, Watkins was "actively involved in the sale of [the MHEC] assets." (Watkins Dep. (Second) 15.) Indeed, Watkins provided so many documents relating to the sale to ECP that he felt he could fairly testify under oath that "99.9%" of them went to Eric Stetzel. (*Id.* at 9–10.) The Supreme Court declared comparable evidence "sufficiently substantial to support

11

an inference that [the manager at the predecessor] informed his prospective employer of the litigation before completion of the sale." *Golden State Bottling*, 414 U.S. at 173.

Testimony from ECP that Watkins didn't tell and Stetzel didn't ask is not enough to render this inference of knowledge unreasonable. After all, in *Golden State Bottling*, Schilling and Golden State's president likewise "testified . . . that they had not informed All American of the litigation before the sale was completed." *Id.* It's true that unspecified "documentary evidence" further indicated Golden State officials had attempted to conceal the sale from the NLRB, *id.*, which is not analogous to this case. But the Supreme Court's discussion indicates that Schilling's managerial role in the predecessor's business, firing of the aggrieved employee, continuation with the successor, and participation in sale negotiations were enough. (*See id.* (describing "this evidence" as sufficient, before mentioning the "documentary evidence" of concealment from the NLRB and other factors).)

The Seventh Circuit has read *Golden State Bottling* the same way. *See Artistic Furniture*, 920 F.2d at 1329 (summarizing the relevant portion of *Golden State Bottling* as an affirmation "that the presence at negotiations between the two companies of an individual who was the predecessor's manager and became the successor's general manager supported the inference that the successor had knowledge of the predecessor's unfair labor practice."). In *Artistic Furniture*, the "only evidence" of notice was the deposition testimony of the predecessor's vice president of finance, Larry Bork. *Id.* Bork indicated he knew of the pension contribution liability in question before the deal. *Id.* Like Watkins, Bork had "at least one meeting and a number of phone conversations" with the officials from the successor before the acquisition. *Id.* "[Q]uestions about the company" of unknown substance "were discussed," and Bork communicated with the successor's shareholders about his own future employment. Though it was "unclear from Bork's

12

testimony whether . . . he informed [the successor] before the sale took place," and the facts did not "conclusively prove actual knowledge," the Seventh Circuit stated such evidence "might support a reasonable inference" of actual knowledge. *Id.*

The key distinguishing facts between *Artistic Furniture* and this case are Watkins's testimony that he actively concealed Goodpaster's claim from ECP, and Stetzel's testimony that he did not learn of it. But testimony of this sort didn't carry the day for the successor in *Golden State Bottling*, so it should not be decisive here, either. Moreover, Watkins's pre-sale collaboration with ECP appears to have been more substantial than Bork's cooperation with the successor in *Artistic Furniture*. A fact finder could reasonably infer Watkins and ECP reached an unspoken understanding to prevent further evidence of knowledge of Goodpaster's claim from coming into existence. Indeed, "[i]t is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony must be true." *G-K-G*, 39 F.3d at 746. At the end of the day, Goodpaster has about as much evidence of actual knowledge as there was in *Golden State Bottling* and *Artistic Furniture*, perhaps even a little more. Granting summary judgment by simply giving more weight to ECP's evidence was not, and is not, an option. *E.g.*, *McCann*, 622 F.3d at 752.

Consequently, the Court's constructive-notice ruling is not controlling; appellate reversal on that question would not affect the outcome of the litigation.

### b. Equitable Imputation of Actual Knowledge

Because successor liability is a doctrine of equity, the Court considers further whether there is a basis other than agency law to impute Kellen Watkins's actual knowledge of Goodpaster's claim to ECP. *See Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S.

at 256 (emphasizing sensitivity to the particular factual circumstances of the individual case), *cited in Tasemkin, Inc.*, 59 F.3d at 49.

As Goodpaster demonstrates, Watkins was incentivized to "serve two masters" while negotiating the deal. By means of smaller transactions before the major asset sale, ECP prolonged MHEC's existence as a nominally independent entity and enabled it to continue paying Watkins. Goodpaster is right these critical infusions of cash made Watkins's "paycheck . . . in substance an ECP paycheck," even though in name, Watkins continued to work only for MHEC. The same payments also gave ECP some de facto control over MHEC before ECP closed on the asset purchase. Moreover, ECP had communicated to Watkins that it stood ready to provide him a salary after the assets changed hands. (Stetzel Dep. 96–97.) He has in fact taken that job, continuing to run the MHEC business under ECP's banner. Watkins agrees he had "two objectives" during the process of pitching MHEC's assets to ECP—to secure a job with ECP and to entice ECP to buy MHEC's assets. (Watkins Dep. (Second) 10.) As Watkins's colorful testimony reflects, he pursued these objectives with gusto: "I . . . put together an Excel spreadsheet – and just summarized, but I didn't show any contingent liabilities. I wanted this pig to look as good as I could make it look." (*Id.* at 10–11.)

Such facts could justify equitably imputing Watkins's actual knowledge to ECP. ECP is now profiting from the same line of operations under which Goodpaster's claim arose. ECP directly contributed to Watkins's incentive not to disclose the claim. And now, by asserting the defense of no notice, ECP seeks to gain from what may have been a conscious decision by Watkins to suppress information for ECP's and his own benefit. Reducing the risk that a business organization might deploy someone outside the organization "as a shield against the legal

14

consequences of facts the [organization] would prefer not to know," Restatement (Third) of Agency § 5.03 cmt. (2006), ought to be as much a goal of equity as it is of agency law.

What's more, part of Goodpaster's case is that Watkins himself was involved in perpetrating the illegal age discrimination. (Pl.'s Aug. 16, 2010, Br. Opp. Mot. Partial Summ. J., DE 32, at 1–3.) ECP's election to remain in league with one of the accused discriminators further supports the proposition that it would be more equitable to impute Watkins's actual knowledge to ECP than to deny compensation to the possible victim.

To recap the entire discussion of the controlling-issue prong, constructive notice based on a failure to perform due diligence is not an essential ground for the Court's denial of summary judgment. The Court would alternatively deny summary judgment because Goodpaster has enough evidence of actual pre-sale knowledge by an ECP agent to proceed. Goodpaster could also satisfy the notice requirement by imputing Watkins's actual pre-sale knowledge of Goodpaster's claim to ECP on the basis of equity.

### 3. Question of Abstract Law

"'[Q]uestion of law' as used in section 1292(b) has reference to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine . . . ." *Ahrenholz*, 219 F.3d at 676. It's a "'pure' question of law rather than merely . . . an issue that might be free from a factual contest," one "the court of appeals [can] decide quickly and cleanly without having to study the record." *Id.* at 677. The application of a doctrine to particular facts generally does not pass the abstractness test. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir. 2010) (rejecting interlocutory appeals from "routine applications of well-settled legal standards").

As demonstrated by the discussion of whether constructive notice was controlling, the issue whether Goodpaster has raised a reasonable inference of timely actual knowledge by an ECP agent is highly fact-sensitive. So is the issue of the equity-based imputation of Watkins's pre-sale knowledge to ECP. Consequently, the denial of summary judgment presents no question of law or set of questions of law that is both controlling and abstract.

### 4. Prospect of Materially Advancing the Litigation

Whether an interlocutory appeal may materially advance the litigation, *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012), is academic in this case because there is no abstract and controlling question of law, and the criteria for certification are conjunctive. *Ahrenholz*, 219 F.3d at 676.

### E. CONCLUSION

The Court **DENIES** ECP's Motion (DE 114). Goodpaster's motion for leave to supplement his brief with omitted authorities (DE 118) is **DENIED** because those authorities were available to him when he responded to ECP's Motion and he has not explained his "neglect." (*Id.* at 1.)

**SO ORDERED** on March 18, 2013.

                                                     s/ Joseph S. Van Bokkelen  
                                                  JOSEPH S. VAN BOKKELEN  
                                                  UNITED STATES DISTRICT JUDGE